UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TIMOTHY JENKINS,

                Petitioner,                                    Hon. Paul L. Maloney

v.                                                  Case No. 1:07-CV-957

KENNETH McKEE,

                Respondent.

_____/


## REPORT AND RECOMMENDATION

        This matter is before the Court on Jenkins' petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Jenkins' petition be **denied**.


## BACKGROUND

        As a result of events that occurred on or about May 24, 2003, Petitioner was charged with conspiracy to commit first degree murder, assault with intent to murder, discharging a firearm from a vehicle, second-degree murder, possession of a firearm by a felon, possession of a firearm during the commission of a felony, and carrying a concealed weapon. Several individuals testified at Petitioner's bench trial. The relevant portions of their testimony are summarized below.

**Elisa Menchaca**

On the evening of May 24, 2003, Menchaca, her husband, Rafael, and their son were traveling home in a Suburban. (Trial Transcript, September 1, 2004, 15-18). As Rafael was driving on Veterans Memorial Parkway, he began to experience difficulty with the Suburban. (Tr. 18-20). To prevent further damage to the vehicle, Rafael slowed to a speed of approximately five miles per hour. (Tr. 20). Soon thereafter, an identical Suburban, traveling at a high rate of speed, passed Rafael. (Tr. 20-21). A moment later, a burgundy or maroon "Blazer type" vehicle pulled up directly beside Rafael and individuals therein began firing at the Suburban. (Tr. 21-27). Rafael was struck by a bullet, at which point he "stepped on it" and "took off." (Tr. 27). The Blazer then turned around and Rafael was taken to the hospital. (Tr. 27-32). Menchaca heard "more than one gun" firing at her vehicle. (Tr. 28). One of the weapons "was faster" and "a little bit louder." (Tr. 29-30).

**Rafael Menchaca**

In the early morning hours of May 25, 2003, Rafael, his wife, Elisa, and their son were traveling home in a Suburban. (Trial Transcript, September 1, 2004, 48-50). As Rafael was driving, he began to hear an unusual noise coming from the vehicle. (Tr. 50-51). Rafael was unable to discern the source of the noise, so he slowed down to approximately five miles per hour. (Tr. 51). Soon thereafter, another Suburban, painted the same color, passed Rafael traveling at a high rate of speed. (Tr. 51-52). A short distance later, just before Rafael reached McGill Street, a red vehicle (a Blazer or Bravado) "pulled right along" the Suburban. (Tr. 52-53, 58). Rafael then heard multiple weapons firing, one of which struck him in the stomach. (Tr. 53-55). Rafael then "stepped

on it and took off." (Tr. 55).  Rafael was taken to the hospital where he underwent surgery.  (Tr. 55-57).

**Jack Long**

As of May 25, 2003, Long resided in the vicinity of McGill and Veterans Memorial Parkway. (Trial Transcript, September 1, 2004, 72-74). At approximately 1:30 a.m. that morning, Long heard "about seven shots." (Tr. 74-75). Long testified that they sounded as if they originated "right under my window." (Tr. 74).

**Barry Nelson**

As of May 25, 2003, Nelson was employed as the deputy director of 911 services for Saginaw County. (Trial Transcript, September 1, 2004, 77-78). At 1:32 a.m. that morning, 911 Central Dispatch received a call that a man had been shot near the intersection of Veterans Memorial Parkway and McGill. (Tr. 78-79). Police officers were dispatched to the area and a few minutes later reported that "there was a vehicle facing the wrong way" and "one person down." (Tr. 80).

**Matt Gerow**

As of May 25, 2003, Gerow was employed as a City of Saginaw Police Officer. (Trial Transcript, September 1, 2004, 83-84). At 1:32 a.m. that morning, Officer Gerow was dispatched to the intersection of Veterans Memorial Parkway and McGill. (Tr. 84). When Gerow arrived at the location he observed a burgundy Chevy Blazer, license plate number 9FDQ90. (Tr. 84-86, 100). The Blazer had "sideswiped" a concrete light pole and was facing the wrong direction. (Tr. 84-86, 93-94, 108-09). The vehicle struck the pole with so much force that "part of the light. . .actually fell off into the roadway." (Tr. 109).

Approximately 15-20 feet away from the Blazer, Officer Gerow observed a black

male laying in the grass. (Tr. 89-90). Later investigation identified this man as Ronell Gary Frazier. (Tr. 110). It appeared that Frazier had also struck the concrete light pole. (Tr. 108-09). Gerow approached Frazier and "observed that he had a large laceration through his forehead" from which "brain matter" was oozing. (Tr. 90). Frazier was not breathing and an examination revealed no evidence of a pulse. (Tr. 90).

Officer Gerow did not search the Blazer, but a cursory observation revealed the presence of shell casings inside the vehicle. (Tr. 99, 102-04). Gerow also observed shell casings "scattered throughout the roadway." (Tr. 103-04). Some of the shell casings, 5.56 millimeter caliber,[1] were fired from an AR-15.[2] (Tr. 104-06). An AR-15 was recovered at the scene laying "between the victim and the [concrete light] pole." (Tr. 107). Officer Gerow also recovered 9 millimeter shell casings which cannot be fired from an AR-15. (Tr. 104-06).

Because two doors of the Blazer were open, officers concluded that Frazier had not been alone in the vehicle. (Tr. 111-12). Accordingly, a canine unit was dispatched to the scene. (Tr. 112). After "sniff[ing] around the vehicle," the canine unit tracked directly to a residence located at 960 Athens which officers immediately secured. (Tr. 112).

---

[1] A 5.56 millimeter round is the same as a .223 caliber round. (Tr. 105).

[2] The trial transcript refers to this weapon as an "air 15," an obvious error by the transcriptionist. The AR-15 is a widely available semi-automatic rifle that fires 5.56 millimeter rounds. *See, e.g.*, 223.5.56 NATO Ammunition, available at http://www.ar15pro.com/category/720-223_Ammo.aspx (last visited on March 2, 2010).

**Katrina Carter**

On the evening of May 24, 2003, Carter allowed Petitioner to borrow her vehicle, a 2000 burgundy Blazer, license plate number 9FDQ90. (Trial Transcript, September 1, 2004, 124-26). Before Petitioner borrowed the vehicle, it did not contain any spent shell casings. (Tr. 127-28). Carter identified the vehicle which struck the light pole on Veterans Memorial Highway in the early morning hours of May 25, 2003, as her vehicle. (Tr. 127).

**Gary Hartmann**

As of May 2003, Hartmann was employed as an auto mechanic for the City of Saginaw. (Trial Transcript, September 1, 2004, 131-32). Hartmann examined Katrina Carter's Blazer and determined that there was no evidence of mechanical failing that could account for the accident that occurred in the early morning hours of May 25, 2003. (Tr. 132-34).

**James Walny**

As of May 25, 2003, Walny was employed as a detective for the City of Saginaw Police Department. (Trial Transcript, September 2, 2004, 5-6). Early that morning, Walny was dispatched to the scene of the aforementioned accident. (Tr. 5-6). After investigating the matter, Detective Walny concluded that at the time the Blazer struck the light pole, Ronell Frazier was "riding with his body out [of] the passenger window. . .sitting on the window sill." (Tr. 6-8).

Walny also observed two cell phones laying on the ground. (Tr. 8, 27-28). Another detective answered one of the cell phones when it began ringing. (Tr. 8). The caller asked to speak with "Tim." (Tr. 8). When the detective identified himself as a police officer, the caller hung up.

(Tr. 8-9). Walny then notified Frazier's family of his passing. (Tr. 9). Frazier's family informed Walny that "more than likely" Petitioner had been driving the Blazer because Petitioner and Frazier "were always together" and Petitioner was "always driving the Blazer." (Tr. 9).

At approximately 5:00 p.m. on May 25, 2003, Detective Walny and Detective Robert Ruth interviewed Petitioner.[3] (Tr. 11-12). While the record does not contain a transcript of this interview, Walny testified that Petitioner acknowledged the following facts: (1) Petitioner and Frazier were riding around in the Blazer on the night in question; and (2) Frazier was armed with a "machine gun." (Tr. 14). The results of Detective Walny's subsequent investigation were "inconsistent with" Petitioner's statements during his initial interview. (Tr. 17). Accordingly, Detectives Walny and Ruth interviewed Petitioner a second time on May 28, 2003.[4] (Tr. 17-18).

**Addison Burton**

As of May 25, 2003, Burton was employed as a patrol officer for the Saginaw Police Department. (Trial Transcript, September 2, 2004, 29-30). Shortly after 1:30 a.m. Officer Burton was dispatched to the intersection of Veterans Memorial Highway and McGill to investigate a shooting. (Tr. 30). Burton assisted in processing the scene and searching for evidence. (Tr. 30-32).

**Ruben Vasquez**

As of May 25, 2003, Vasquez was employed as a police officer with the Saginaw

---

[3]  This interview was recorded and played for the jury. (Tr. 12-13). Neither the recording nor a transcript thereof was submitted to the Court.

[4]  This interview was also recorded and played for the jury. (Tr. 18-19). Neither the recording nor a transcript thereof was submitted to the Court. Judging from the description by the Michigan Court of Appeals of this interview, it appears that Petitioner made numerous inculpatory statements during these interviews.

Police Department. (Trial Transcript, September 2, 2004, 37). Specifically, Officer Vasquez was teamed with Mohawk, a German Shepard, to form a canine unit. (Tr. 37-38). Early that morning, Vasquez and Mohawk were dispatched to the intersection of Veterans Memorial Highway and McGill. (Tr. 39). After examining Katrina Carter's Blazer, Mohawk tracked a scent to a house located at 960 Athens.[5] (Tr. 39-42).

## James Engelhardt

As of May 23, 2003, a Friday, Engelhardt was employed as the manager of Howard Structural Steel located at 807 Veterans Memorial Parkway. (Trial Transcript, September 2, 2004, 44-45). When Engelhardt returned to work on May 26, 2003, a Monday, he observed a bullet hole in an office window that faced Veterans Memorial Parkway. (Tr. 45-46). The bullet hole was not present when Engelhardt departed work on May 23, 2003. (Tr. 50).

## Jacque Westendorf

As of May 25, 2003, Westendorf was employed as an operating room nurse at Covenant HealthCare. (Trial Transcript, September 2, 2004, 51). She assisted in the operation performed on Rafael Menchaca early that morning. (Tr. 51-52). After the surgeon removed the bullet from Menchaca's abdomen, he handed it to Westendorf who placed it in a specimen container and gave it to Officer Joseph Dutoi. (Tr. 52-53).

---

[5] No testimony was presented concerning the occupants of this location or Petitioner's possible connection therewith. From the prosecutor's closing argument, it appears that such was addressed during Petitioner's interviews with the police, the transcripts of which are not in the present record.

**Joseph Dutoi**

As of May 25, 2003, Dutoi was employed as a City of Saginaw Police Officer. (Trial Transcript, September 2, 2004, 54). Early that morning, Officer Dutoi was dispatched to the Covenant Emergency Room where he received "a little plastic container" containing the bullet removed from Rafael Menchaca's abdomen. (Tr. 54-58).

**James Vondette**

As of May 27, 2003, Vondette was employed as a Detective for the City of Saginaw Police Department. (Trial Transcript, September 2, 2004, 62-63). On that date, Vondette examined the Suburban that Rafael Menchaca was driving on May 25, 2003. (Trial Transcript, September 1, 2004, 17; Trial Transcript, September 2, 2004, 63). This examination revealed the presence of two bullet holes, one through the driver's door and another through the driver's side rear quarter panel. (Trial Transcript, September 2, 2004, 63-64). Detective Vondette was able to retrieve the bullet that passed through the rear quarter panel. (Tr. 66).

**Lisa Heusted**

As of May 25, 2003, Heusted was employed as a Detective Sergeant with the Michigan State Police performing latent fingerprint analysis. (Trial Transcript, September 2, 2004, 68-74). Early that morning, Detective Sergeant Heusted was dispatched to the intersection of Veterans Memorial Parkway and McGill. (Tr. 73-74). Upon arriving, Heusted assisted several other officers process the crime scene. (Tr. 74). Heusted recovered a .223 caliber rifle, an ammunition magazine, and six fired .223 caliber cartridges. (Tr. 74-78). The weapon had a live round in the

chamber and the ammunition magazine contained an unspecified number of .223 caliber cartridge casings. (Tr. 86). She also discovered four fired nine millimeter cartridge casings in the street, as well as five fired nine millimeter cartridge casings inside the Blazer. (Tr. 78-79).

An examination of the rifle and cartridge casings revealed no identifiable fingerprints. (Tr. 92). An examination of the interior of the Blazer revealed ten latent fingerprints, none of which matched the victim, Ronell Frazier. (Tr. 91). Detective Sergeant Heusted was not provided with fingerprint exemplars from Petitioner or Katrina Carter so she was unable to determine whether either individual had left any of the ten fingerprints found within the Blazer. (Tr. 91-92).

**Tani Watkins**

As of May 25, 2003, Watkins was employed as a forensic scientist for the Michigan State Police. (Trial Transcript, September 3, 2004, 4-6). Early that morning, Watkins was dispatched to the intersection of Veterans Memorial Parkway and McGill to help investigate an accident. (Tr. 6). An examination revealed that the victim struck his head on a nearby concrete light pole. (Tr. 6-25). Watkins also recovered the following items for subsequent forensic evaluation: (1) paint samples from the Blazer and the light pole and (2) human tissue from the light pole. (Tr. 14-20).

**Keith Lamont**

Lamont, a forensic scientist specializing in paint analysis for the Michigan State Police, analyzed paint samples provided to him from Tani Watkins, concluding that they likely originated from the same source. (Trial Transcript, September 3, 2004, 27-38).

**Jeffrey Nye**

Nye, a forensic biologist for the Michigan State Police, performed DNA analysis of tissue samples provided to him from Tani Watkins, concluding that the tissue from the light pole matched Ronell Frazier. (Trial Transcript, September 3, 2004, 40-55).

**Timothy Robbins**

As of May 25, 2003, Robbins was employed as an accident reconstruction expert for the Michigan State Police. (Trial Transcript, September 3, 2004, 56-59). Early that morning, Robbins was dispatched to the intersection of Veterans Memorial Parkway and McGill to investigate an accident. (Tr. 59). Robbins observed that the vehicle involved in the accident struck a light pole. (Tr. 62). Robbins determined that when the vehicle struck the pole it was traveling at least 53 miles per hour and was likely traveling at a higher rate of speed before striking the pole. (Tr. 71-72). The speed limit at that particular location was 35 miles per hour. (Tr. 73). Robbins further determined that given the vehicle's trajectory, the driver was "driving that vehicle northbound" while simultaneously "trying to watch a southbound vehicle on the other side of the parkway." (Trial Transcript, September 8, 2004, 17-21).

**Kanu Virani**

On May 26, 2003, Dr. Virani conducted an autopsy on Ronell Frazier. (Trial Transcript, September 8, 2004, 4-8). The doctor determined that Frazier died "probably instantaneous[ly]" from multiple injuries suffered after striking a light pole at a rate of speed "in excess of" 60 miles per hour. (Tr. 8-16).

**Robert Ruth**

As of May 25, 2003, Ruth was employed as a Detective with the City of Saginaw Police Department. (Trial Transcript, September 8, 2004, 22). As part of his investigation of the incident in question, Ruth interviewed Petitioner. (Tr. 26-27).

During his interview with Detective Ruth, Petitioner began discussing other shootings that had recently occurred in the area. (Tr. 29). One of these incidents occurred at the Farwell Market and another involved a man named Ricky Holmes. (Tr. 29, 36). Ruth described these incidents as part of "a little gang war going on in Saginaw basically between the north and the south." (Tr. 29). Petitioner stated that he was from the north side. (Tr. 37). According to Petitioner, approximately 7-10 days before the incident on May 25, 2003, Ricky Holmes was shot and killed. (Tr. 33-36). Holmes was "affiliated with the south side" and, as a result, "the north side" was blamed for his murder. (Tr. 36-37). Petitioner further reported that on May 24, 2003, "the south side" "came through" the Farwell Market, which is located on the north side, and began shooting because "they said everybody on the north side gotta pay for" Holmes' murder. (Tr. 34-37). Petitioner asserted that Ronell Frazier (a.k.a. Harry) was upset about these shootings. (Tr. 29, 33). Petitioner further asserted, "that's what this is all about." (Tr. 36).

**Ron Ainslie**

As of May 25, 2003, Ainslie was employed as a Sergeant with the Michigan State Police. (Trial Transcript, September 8, 2004, 45-49). Specifically, Ainslie was a member of a firearms, toolmark and explosives team, performing analysis in "the identification of fired cartridge cases and fired bullets, to determine whether they were fired out of a particular firearm." (Tr. 46).

12

In the early morning hours of May 25, 2003, Sergeant Ainslie was dispatched to the intersection of Veterans Memorial Parkway and McGill to investigate a potential crime scene. (Tr. 49-50). After arriving at this location, Ainslie began searching for "any potential firearms evidence." (Tr. 50). Sergeant Ainslie discovered two 9-millimeter shell casings in the southbound lanes of Veterans Memorial Parkway, two 9-millimeter shell casings in the intersection of Veterans Memorial Parkway and McGill, and six 9-millimeter shell casings inside the Blazer. (Tr. 52-60). Ainslie also discovered six .223 caliber shell casings at the scene. (Tr. 60). The location of several of the shell casings was consistent with somebody firing a weapon while sitting with their upper body outside the passenger side window and firing over the top of the Blazer. (Tr. 63).

Sergeant Ainslie examined the bullet recovered from the Suburban that Rafael Menchaca was driving, as well as the bullet recovered from Menchaca's abdomen. (Tr. 64). The bullet recovered from the Suburban was "characteristic of a 9-millimeter fired bullet." (Tr. 64-65). With respect to the other bullet, Ainslie was unable to provide a definitive identification, but asserted that it was not inconsistent with having been fired by a 9-millimeter weapon. (Tr. 65-66).

Sergeant Ainslie examined the .223 caliber shell casings found at the scene and determined that "they could have been fired from" the weapon recovered at the scene. (Tr. 66-68). With respect to the various 9-millimeter shell casings recovered at the scene, Sergeant Ainslie concluded that they were not fired from the same weapon, but were instead fired from two distinct weapons. (Tr. 68-70). Specifically, Ainslie concluded that the 9-millimeter shell casings recovered from the Blazer and at the intersection of Veterans Memorial Parkway and McGill were fired from the same weapon, whereas the shell casings recovered from the southbound lanes of Veterans Memorial Parkway were fired from a different weapon. (Tr. 73). Thus, Sergeant Ainslie concluded

13

that at least three firearms were involved in the incident in question. (Tr. 73-74).

Following the presentation of evidence, the jury found Petitioner guilty of conspiracy to commit first degree murder, assault with the intent to commit murder, discharge of a weapon from a vehicle, negligent homicide, possession of a firearm by a felon, possession of a firearm during the commission of a felony, and carrying a concealed weapon. (Trial Transcript, September 10, 2004, 3). Petitioner received a sentence of life in prison on the conspiracy to commit first degree murder conviction, as well as a consecutive sentence of two years for possession of a firearm during the commission of a felony. (Dkt. #27-31). With respect to his other convictions, Petitioner received lesser terms of imprisonment. (Dkt. #27). Petitioner appealed his convictions in the Michigan Court of Appeals, asserting the following claims:

I.    The trial court deprived the defendant of his due process and equal protection rights to a fair trial when it denied the defense motion for a directed verdict as to the conspiracy to commit 1st degree premeditated murder and the 2d degree murder charges.

II.    The trial court deprived the defendant of his due process and equal protection rights to a fair trial when it admitted DNA evidence without a proper foundation and when it permitted over objection hearsay testimony from a police officer about an alleged gang war taking place in Saginaw at the time of the incident.

III.    The trial court unlawfully deprived the defendant of due process of law and reversibly erred in permitting the prosecutor to commit misconduct requiring reversal.

IV.    The trial court violated the United States and Michigan constitutions in sentencing the defendant to prison terms of 40-60 years on the habitual offender 4th supplement arising out of the AWIM conviction, to a prison term of 10-15 years on the habitual

offender 4th supplement arising out of the discharge of a firearm from a motor vehicle conviction, to a prison term of 10-15 years on the habitual offender 4th supplement arising out of the negligent homicide conviction, to a prison term of 10-20 years on the habitual offender 4th supplement arising out of the possession of a firearm by a felon conviction, and to a prison term of 10-20 years on the habitual offender 4th supplement arising out of the CCW conviction.

V.      In the event the defendant is resentenced without the legal prerequisites having been met, the trial court will have reversibly erred in resentencing the defendant on the conspiracy to commit 1st degree premeditated murder conviction.

VI.     Was Defendant Jenkins denied his Fifth, Sixth and Fourteenth Amendment rights to a fair, indifferent, and impartial jury, where a member of the jury failed to disclose personal bias and prejudice during voir dire and was Defendant denied his Sixth Amendment right to effective assistance of counsel, where counsel failed to effectively voir dire this juror and request that the juror be removed for cause?

VII.    Was the Defendant denied his due process rights to a fair trial, where the prosecutor improperly shifted the burden of proof by suggesting that the defense has to establish the whereabouts of allegedly missing handguns, and by making an improper argument appealing to the jurors' civic duty to convict, and was defendant denied his Sixth Amendment right to effective assistance of counsel, where counsel failed to object to this prosecutorial misconduct?

VIII.   Was Defendant Jenkins denied his due process rights to a fair trial by the introduction of highly inflammatory photographs, combined with the prosecutor's mocking the defendant in a manner to arouse the sympathies and prejudices of the jury, and was Defendant deprived of his Sixth Amendment right to effective assistance of counsel, where counsel failed to object?

IX.     Was Defendant Jenkins deprived of his Sixth Amendment right to effective assistance of counsel, where his trial counsel failed to investigate, interview and call a witness crucial to his defense, and failed to obtain telephone records?

X.      Was Defendant Jenkins denied his due process rights to a fair trial, where the prosecutor bolstered the credibility of fact-witnesses by arguing that their version of events was consistent with an expert's testimony, and was Defendant deprived of his Sixth Amendment right to effective assistance of counsel, where counsel failed to object?

XI.     Was Defendant Jenkins deprived of his due process rights to a fair trial by the cumulative effect of multiple errors committed in the trial proceedings?

The Michigan Court of Appeals affirmed Petitioner's convictions. *People v. Jenkins*, 2006 WL 2632317 (Mich. Ct. App., Sept. 14, 2006). Petitioner subsequently moved in the Michigan Supreme Court for leave to appeal.[6] The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Jenkins,* 726 N.W.2d 14 (Mich., Jan. 29, 2007). On September 26, 2007, Petitioner initiated the present action, asserting the following claims:

I.      Did the trial court deprive the Petitioner of his due process and equal protection rights to a fair trial when it denied the defense motion for a directed verdict as to the conspiracy to commit first-degree murder and the second degree murder charge?

II.     Did trial court deprive the Petitioner of his due

---

[6] It is not clear from the record precisely what claims Petitioner asserted to the Michigan Supreme Court. This is of no consequence, however. Respondent has not asserted that Petitioner failed to properly exhaust any of the claims asserted in his petition for writ of habeas corpus. Moreover, even in the event that Petitioner has failed to properly exhaust any of the claims herein asserted, the Court notes that such can be denied on the merits, the failure to properly exhaust notwithstanding. *See* 28 U.S.C. § 2254(b)(2).

process and equal protection rights to a fair trial when it admitted DNA evidence without a proper foundation and when it permitted over objection hearsay testimony from a police officer about an alleged gang war taking place in Saginaw at the time of the incident?

III.     Did trial court unlawfully deprive the Petitioner of due process of law and reversibly err in permitting the prosecutor to commit misconduct requiring reversal?

IV.     Did the trial court violate the United States and Michigan constitutions in sentencing the Petitioner to a prison term of 40-60 years on the habitual offender 4th supplement arising out of the AWIM conviction, to a prison term of 10-15 years on the habitual offender 4th supplement arising out of the discharge of a firearm from a motor vehicle conviction, to a prison term of 10-15 years on the habitual offender 4th supplement arising out of the negligent homicide conviction, to a prison term of 10-20 years on the habitual offender 4th supplement arising out of the possession of a firearm by a felon conviction, and to a prison term of 10-20 years on the habitual offender 4th supplement arising out of the CCW conviction?

V.     In the event the defendant is resentenced without the legal prerequisites having been met, will the trial court have reversibly erred in resentencing the Petitioner on the conspiracy to commit first degree premeditated murder conviction?

VI.     Did the Michigan Supreme Court contradict itself in rendering their decision on Petitioner's direct appeal?

## STANDARD OF REVIEW

Jenkins' petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)     An application for a writ of habeas corpus on behalf of a
        person in custody pursuant to the judgment of a State court
        shall not be granted with respect to any claim that was
        adjudicated on the merits in State court proceedings unless
        the adjudication of the claim —

        (1)     resulted in a decision that was contrary to, or involved
                an unreasonable application of, clearly established
                Federal law, as determined by the Supreme Court of
                the United States, or

        (2)     resulted in a decision that was based on an
                unreasonable determination of the facts in light of the
                evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's

jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

In certain circumstances, however, the deferential standard articulated above does not apply. First, if the state court resolves a particular claim but fails to articulate its analysis, the Court must apply "modified AEDPA deference." *Vasquez v. Jones*, 496 F.3d 564, 569-70 (6th Cir. 2007). Under this standard, "the court conducts a 'careful' and 'independent' review of the record and applicable law, but cannot reverse 'unless the state court's decision is contrary to or an unreasonable application of federal law.'" *Id.* at 570. However, where the state court has altogether failed to review a particular claim, such is reviewed de novo. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). In such circumstances, the court conducts a *de novo* review. *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

I.      **Directed Verdict Claim**

As previously noted, Petitioner was initially charged with conspiracy to commit first degree murder as a result of the incident involving the Menchacas and second degree murder for the death of Ronell Frazier. At the close of proofs, Petitioner moved for a directed verdict as to all charges against him, including the charges of conspiracy to commit first degree murder and second degree murder. (Trial Transcript, September 8, 2004, 80-82). The trial court denied Petitioner's motion on the ground that "a rational trier of fact. . .could conclude beyond a reasonable doubt that

the crimes were committed." (Tr. 82-83). Petitioner asserts that the denial of his motion for directed verdict as to these two charges violated his constitutional rights.

A.      Conspiracy to Commit First Degree Murder

No error of constitutional magnitude occurs where a state court denies a motion for directed verdict as to a charge for which there exists constitutionally sufficient evidence to support a conviction. *See Tinsley v. Million*, 399 F.3d 796, 815 (6th Cir. 2005). Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

As of the date Petitioner committed the acts in question, a conspiracy was defined under Michigan law as "a partnership in criminal purposes" in which "two or more individuals. . .have voluntarily agreed to effectuate the commission of a criminal offense." *People v. Justice*, 562

N.W.2d 652, 657-58 (Mich. 1997). To demonstrate the existence of a conspiracy, there must exist evidence "that the individuals specifically intended to combine to pursue the criminal objective of their agreement." *Id.* at 658. Such a showing is "critical" because "the gist of the offense of conspiracy lies in the unlawful agreement." *Id.* Direct proof of a conspiracy, however, is not required. *Id.* at 659. The existence of a conspiracy may be inferred "from the circumstances, acts, and conduct of the parties." *Id.* Because Petitioner was charged with conspiring to commit first degree murder, it must be demonstrated that Petitioner and his co-conspirators agreed to commit an intentional, premeditated, and deliberate killing. *See People v. Foster*, 2003 WL 1558238 at *3 (Mich. Ct. App., Mar. 25, 2003). The Michigan Court of Appeals rejected this particular claim, observing that:

> The evidence supported an inference that Frazier and at least one other person fired guns at the Menchacas' family's Suburban from defendant's Blazer. Police found two different kinds of ammunition casings at the crime scene and inside the Blazer, and Elisa and Rafael both testified that they could hear two different guns firing at the same time. There was no evidence that anyone other than defendant and Frazier were in the Blazer. The jury could have inferred from this evidence that both defendant and Frazier were shooting guns, and that defendant lost control of the Blazer because he was shooting a gun while driving. Although police never recovered nine-millimeter weapons, the jury could have inferred that defendant purposefully took the guns when he abandoned the Blazer and Frazier at the scene. The evidence was also sufficient to support an inference that defendant and Frazier had a motive to shoot persons connected with the south-side gang. The jury could have found that defendant and Frazier believed south-side gang members occupied the Menchacas' Suburban and combined to commit a premeditated and deliberated drive-by shooting against the occupants, intending to kill them.

*Jenkins*, 2006 WL 2632317 at *2.

The rejection of this claim by the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, it was

22

not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

B.      Second Degree Murder

With respect to the charge of second degree murder, the jury was instructed that it "may also consider whether [Petitioner] is guilty of a less serious crime known as involuntary manslaughter or negligent homicide." (Trial Transcript, September 9, 2004, 96-100). The jury did not convict Petitioner of second degree murder, but instead found him guilty of negligent homicide. Petitioner asserts that he is entitled to relief because it was error to deny his motion for directed verdict as to a charge on which he was subsequently acquitted.

Every criminal defendant has a right not to be convicted of a crime unless there exists evidence "sufficient to show beyond a reasonable doubt the existence of every fact necessary to constitute the crime charged." *In re Winship*, 397 U.S. 358, 363 (1970). As several courts have recognized, however, "the Supreme Court has never held that the submission of a charge, upon which there is insufficient evidence, violates a defendant's constitutional rights where the defendant is acquitted of that charge." *Rogers v. Davis*, 2009 WL 701311 at *11 (E.D. Mich., Mar. 13, 2009); *Thomas v. Bell*, 2008 WL 268892 at *5 (E.D. Mich., Jan. 29, 2008) (same); *Sherman v. Howes*, 2009 WL 4250763 at *1 (W.D. Mich., Nov. 24, 2009) (recognizing that "[a]t the very least, there is no clearly established federal law on this point"). In light of this authority, Petitioner cannot establish that the submission to the jury of the charge of second degree murder violates clearly established law as articulated by the United States Supreme Court. Furthermore, the evidence presented at trial was sufficient to support a conviction on the second degree murder charge.

Under Michigan law in effect at the time Petitioner acted, the elements of second degree murder were: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. *See People v. Bailey*, 549 N.W.2d 325, 331 (Mich. 1996) (citing *People v. Dykhouse*, 345 N.W.2d 150 (Mich. 1984)). Malice is defined as "the intent to kill, an intent to inflict great bodily harm, or the wanton and wilful disregard of the likelihood that the natural tendency of the defendant's behavior is to cause death or great bodily harm." *People v. Hopson*, 444 N.W.2d 167, 169 (Mich. Ct. App. 1989). Malice may be inferred "from the facts and circumstances of the killing," *People v. Kemp*, 508 N.W.2d 184, 187 (Mich. Ct. App. 1993), including "evidence that a defendant intentionally set in motion a force likely to cause death or great bodily harm." *People v. Aaron*, 299 N.W.2d 304, 327 (Mich. 1980).

The evidence presented at trial revealed that Ronell Frazier died as a result of Petitioner's conduct. While Petitioner may not have acted with an intent to kill or inflict great bodily harm upon Frazier, the evidence was sufficient to support the conclusion that Petitioner exhibited wanton and wilful disregard of the likelihood that the natural tendency of his behavior would cause him to suffer death or great bodily harm. Viewing this evidence in a light most favorable to the prosecution, and according the benefit of all reasonable inferences to the prosecution, a reasonable juror could certainly have found Petitioner guilty beyond a reasonable doubt of second degree murder.

While Petitioner presented this claim on appeal, it was not addressed by the Michigan Court of Appeals. Applying the de novo standard of review, the Court finds that this claim is without merit for the reasons articulated above. Accordingly, this claim raises no issue upon which habeas relief may be granted.

**II.**　　　　**Evidentiary Claims**

As indicated above, Jeffrey Nye conducted DNA analysis on tissue samples recovered from the accident scene. Based on the results of this analysis, Nye concluded that "the tissue from the light pole matched" Ronell Frazier. Detective Ruth also testified concerning a pair of shootings that preceded the incident involving Petitioner and Ronell Frazier. According to Ruth, these antecedent shootings were part of "a little gang war going on in Saginaw basically between the north and the south." Petitioner asserts that admission of these two items of evidence deprived him of his right to a fair trial.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error. *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States. *Id.* In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68). Fundamental fairness does not, however, "require a perfect trial," *Clemmons*, 34 F.3d at 358, and courts have

defined those violations which violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at

512. Whether the admission of evidence constitutes a denial of fundamental fairness "turns upon

whether the evidence is material in the sense of a crucial, critical highly significant factor." *Ege v.*

*Yukins*, 485 F.3d 364, 375 (6th. Cir. 2007).

Petitioner asserts that the DNA evidence was admitted in the absence of a proper

evidentiary foundation. The Michigan Court of Appeals rejected this claim on the ground that

"defendant failed to challenge the reliability of the police's methodology and equipment, and there

is no basis in the record for concluding that Nye's DNA analysis arose from unreliable or faulty

methodology, laboratory equipment, or statistical analysis." *Jenkins*, 2006 WL 2632317 at *3. The

Court agrees with this assessment and further observes that the DNA evidence in question was

neither crucial nor critical to the prosecution's case against Petitioner. The DNA evidence was

merely cumulative to other evidence that established that Ronell Frazier died as a result of striking

the light pole. Thus, this claim raises no issue on which habeas relief may be granted.

As for Detective Ruth's "gang war" testimony, the result is the same. Petitioner

voluntarily discussed with Ruth other shootings that had occurred in the area 7-10 days prior to the

night on which Ronell Frazier was killed. Petitioner stated that these shootings involved groups

from the "south side" and the "north side." Petitioner asserted that retaliation was the motivation

for at least one of these shootings. Petitioner further asserted that retaliation was "what this is all

about," presumably referring his actions on the night of May 25, 2003. In the Court's estimation,

Detective Ruth's statement that these prior shootings were part of a "gang war" was consistent with

Petitioner's own statements to Ruth.

The Michigan Court of Appeals rejected this claim on the ground that "[e]vidence

of the ongoing gang feud was relevant to the issue of defendant's motives for the drive-by shooting."

*Jenkins*, 2006 WL 2632317 at *4. The court noted that "the relationship between the gang feud and the charged crimes was the focus of [Petitioner's] statements to the police." The court further observed that "[t]he evidence of the gang feud provided context for [Petitioner's] police interview, in which the police elicited [Petitioner's] admission that Frazier fired shots at the Suburban, and was relevant to a motive for the assault on the Menchacas' vehicle." *Id.* Admission of this evidence did not deprive Petitioner of a fair trial. This claim, therefore, raises no issue on which habeas relief may be granted.

## III.        Prosecutorial Misconduct

Petitioner next asserts that during his closing argument the prosecutor made unfairly prejudicial comments that served to deprive Petitioner of the right to a fair trial. The comments in question, made after a brief description of the violence that preceded the May 25, 2003 incident, are as follows:

> This gang violence apparently works like the Hatfields and McCoys of history. If one of my family or friends is shot or killed, someone from your family or group of friends must have done it because my group wouldn't do it so we'll retaliate against your group, and it continues on and on with retaliation after revenge, et cetera.

(Trial Transcript, September 9, 2004, 3-4).

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor." *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). The issue is whether the prosecutor's conduct "so infected the trial with unfairness as

to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Thus, even if the challenged comments were improper, habeas relief is available only where the comments "were so flagrant as to render the entire trial fundamentally unfair." *Gillard*, 445 F.3d at 897.

When assessing whether alleged prosecutorial misconduct warrants relief, the Court undertakes a two part analysis. The Court must first determine whether "the prosecutor's conduct and remarks were improper." *Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007). If such is the case, the Court must then determine "whether the impropriety was flagrant and thus warrants reversal." *Id.* at 759. When assessing whether an improper comment resulted in a denial of the right to a fair trial, the Court considers the following factors: (1) the likelihood that the comments mislead the jury or prejudiced the accused; (2) whether the comments were extensive or isolated; (3) whether the remarks were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial. *Id.*

While Petitioner presented this claim to the Michigan Court of Appeals, it was not addressed by the court. Even pursuant to the less stringent de novo standard applicable to those claims not addressed by the state courts, the Court concludes that Petitioner is not entitled to relief. First, the Court is not persuaded that the comments in question were improper. *See, e.g., Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008) (a prosecutor may, among other things, "forcefully assert reasonable inferences from the evidence"). However, if even the challenged comments were improper, the Court finds that such did not deprive Petitioner of a fair trial. The Court is not persuaded that the prosecutor's comments mislead the jury or prejudiced Petitioner. The reference to the Hatfields and McCoys was nothing more than an historical reference employed as a metaphor

for the gang conflict that Petitioner himself described to Detective Ruth. Moreover, the challenged comments were isolated and the evidence against Petitioner was overwhelming. Accordingly, this claim raises no issue upon which habeas relief may be granted.

**IV.**         **Sentencing Claims**

Petitioner received a life sentence on the conspiracy to commit first degree murder conviction and a consecutive sentence of two years for possession of a firearm during the commission of a felony. With respect to his other convictions, Petitioner, as a fourth habitual offender, received the following sentences: (a) 40-60 years for assault with the intent to commit murder; (b) 10-15 years for discharge of a weapon from a vehicle, (c) 10-15 years for negligent homicide, (d) 10-20 years for possession of a firearm by a felon, and (e) 10-20 years for carrying a concealed weapon. With respect to these "other convictions," Petitioner asserts that the "trial court violated the United States Constitutional Amendment VIII by imposing disproportionate sentences."

The Eighth Amendment to the United States Constitution "does not require strict proportionality between crime and sentence." *United States v. Layne*, 324 F.3d 464, 473 (6th Cir. 2003) (quoting *Harmelin*, 501 U.S. at 1001). Instead, the Eighth Amendment simply forbids extreme sentences that are "grossly disproportionate" to the crime committed. *Layne*, 324 F.3d at 473. When a court assesses whether a sentence imposed by a state court satisfies the Eighth Amendment's "limited guarantee of proportionality," it must "grant substantial deference to the. . .legislatures. . .in determining the types and limits of punishments for crimes." *Id.* at 473-74. Accordingly, "a sentence within the maximum set by statute generally does not constitute cruel and unusual punishment." *Id.* at 474.

The sentences Petitioner received for these crimes were within the maximums established by Michigan law. Mich. Comp. Laws §§ 750.83, 750.224f, 750.227, 750.234a, 750.324, 769.12. Furthermore, the sentences in question are in no way "grossly disproportionate" to the crimes committed. Thus, this claim presents no issue upon which habeas relief may be granted.

## V.        Resentencing Claim

With respect to his conviction for conspiracy to commit first degree murder, Petitioner was initially sentenced to serve 40-60 years in prison. (Dkt. #27). This was in error, however, because Michigan law mandated that Petitioner receive a sentence of life in prison for that offense. *Jenkins*, 2006 WL 2632317 at *10. Accordingly, the Michigan Court of Appeals remanded the matter to the trial court with directions to enter "an amended judgment of sentence reflecting a sentence of life imprisonment for [Petitioner's] conspiracy conviction. *Id.* at *11. This was subsequently accomplished. Petitioner asserts that this was improper because the trial court lacked jurisdiction. This claim raises an issue of state law which cannot form the basis for the relief Petitioner seeks. *See* 28 U.S.C. § 2254.

## VI.       State Court Appellate Claim

As previously noted, Petitioner appealed his conviction in the Michigan Court of Appeals, which affirmed his convictions. Petitioner subsequently moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request on the ground that "we are not persuaded that the questions presented should be reviewed by this Court." Petitioner asserts that the decision by the Michigan Supreme Court "denying while refusing to review" his claims constitutes

an unlawful contradiction.

The Court discerns nothing contradictory in the decision by the Michigan Supreme Court. Review by the Michigan Supreme Court is discretionary and in this particular instance the court denied Petitioner's request that it review his claims. Furthermore, the court's decision not to review Petitioner's claims does not violate federal law. As the Supreme Court has recognized, "[t]here is, of course, no constitutional right to an appeal." *Jones v. Barnes*, 463 U.S. 745, 751 (1983); *see also, Goeke v. Branch*, 514 U.S. 115, 119 (1995) ("a convicted criminal has no constitutional right to an appeal"); *United States v. Aloi*, 9 F.3d 438, 443-44 (6th Cir. 1993) ("[i]t has long been recognized that there is no federal constitutional right to an appeal"). This claim, therefore, raises no issue upon which habeas relief may be granted.

## <u>CONCLUSION</u>

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Jenkins' petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file

objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: April 27, 2010

/s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge
